[Civ. No. 391.    Fifth Dist.    Aug. 24, 1964.]

SUN-MAID RAISIN GROWERS OF CALIFORNIA et al.,
    Plaintiffs and Respondents, v. CHARLES PAUL, as
    Director of the Department of Agriculture, et al., De-
    fendants and Appellants.

Stanley Mosk, Attorney General, John Fourt and Philip K. Jensen, Deputy Attorneys General, for Defendants and Appellants.

Jefferson E. Peyser, Orrick, Dahlquist, Herrington & Sutcliffe and B. L. Hoisington as Amici Curiae on behalf of Defendants and Appellants.

Meux, Gallagher, Baker & Manock, John J. Gallagher, Kendall L. Manock, Miles, Sears & Franson and William M. Miles for Plaintiffs and Respondents.

CONLEY, P. J.—The defendant, Charles Paul, as Director of the Department of Agriculture of the State of California, and Stanley Mosk, as Attorney General, applied to this court for a writ of supersedeas to stay a preliminary prohibitory injunction, which restrains the defendants from enforcing the Marketing Order for Processors of Fermenting Material for Alcoholic Beverages of June 22, 1964, of the Director of

Agriculture and the regulations pursuant thereto. This court issued a temporary stay of proceedings and made an order that plaintiffs, Sun-Maid Raisin Growers of California, California Packing Corporation, Bonner Packing Company and West Coast Growers and Packers, Inc., show cause why a writ of supersedeas should not issue. The parties appeared and made complete arguments relative to the application as did, also, counsel for the Wine Institute and E. & J. Gallo Winery, as Amici Curiae.

The plaintiffs, a cooperative organization and several private packing corporations, deal in raisins. On the very day that the state marketing order attacked by the suit was by its terms to go into effect, the plaintiffs filed this action to restrain its enforcement on the principal ground that the field had been preempted by the federal government, and that, consequently, the state authorities had no right to act.

The general background of the litigation is, briefly, as follows: From 1961 to June 30, 1964, a federal Grape Crush Order controlled the marketing of grapes used in the wine-making industry, as well as the residual products thereof. The legally prescribed number of grape growers had voted their approval of the order. It prohibited the crushing of raisins for making fortifying ingredients for wine, excepting, however, that the sweepings and other residual material from the processing of standard raisins could be received by wineries and distilleries for such use; however, the employment of offgrade and substandard raisins and their residual, as well as standard raisins, was prohibited by the Grape Crush Order, from being used for the distilling of spirits. This Grape Crush Order expired by its terms on June 30, 1964, and it was not renewed thereafter due to the negative votes of the grape growers, when the question of the continuation of the order was submitted to them as required by law; this termination resulted in an accumulation of offgrade raisins by packers and processors with the expectation that they would be used when the Grape Crush Order had terminated.

Since the year 1960, there has been in effect a federal order known as "Raisin Order No. 89," dealing with the marketing of raisins and their residuals. It provides that offgrade raisins and the residuals might be used for "distillation and animal feed, or uses other than for human consumption." It is obvious that this provision considered alone permits the use of such raisins in distilling spirits.

Presumably in anticipation of the end of the Grape Crush

Order on June 30, 1964, the Wine Institute requested the California Director of Agriculture to make an official inquiry as to the possibility of the reinstatement by state action of the prohibitions which the Grape Crush Order had contained. One can legitimately infer that the Wine Institute was actuated by a wish to protect the wineries, constituting its membership, which had produced fermenting material used in the making of distilled spirits as a residual of the wine-making process.

In the fall of 1963, there was considerable unseasonal rainfall in the grape producing area, with the result that a large portion of the 1963 crop of grapes and raisins was damaged and did not meet the minimum requirements for standard raisins.

The hearing was held by Harry J. Krade, Chief of the Bureau of Marketing, beginning May 25, 1964; his findings refer to the unseasonal rains of 1963 and the ensuing damage to the crop of that year; he also found that if the damaged raisins were offered to the distillers of spirits in competition with the wineries, it would have a demoralizing effect upon the producers of fermenting materials, and that there would be an oversupply of distilling material beyond the requirements of the industry. Mr. Krade recommended the issuance of an order under the California Marketing Act of 1937, forbidding the use of offgrade raisins for the distilling of spirits, but, contrary to the wish of the Wine Institute which had recommended an effective three-year period for the order, he asked that it be limited to a single year beginning July 1, 1964. The order was issued accordingly by the California Director of Agriculture and the specified effective date was the day following the termination of the federal Grape Crush Order. In effect, it did continue the major prohibitions contained in the Grape Crush Order, which had been set aside through the democratically organized vote of the persons interested.

Prior to its effective date, the proposed order was submitted by Mr. Paul to the processors of fermenting materials and approved by the legally required majority of them. In this connection, the director construed the requirements of section 1300.16, subdivision (a)(1), of the Agricultural Code to refer only to the processors of fermenting material as being "directly affected." One of the questions involved on the appeal in the present litigation is whether or not the plaintiffs herein were, as they claim, also, "directly affected" by the order so

that they should have been permitted to vote on the question whether it should be made.

It will be noted that the order prohibited the use of offgrade raisins in distilling, but it did permit standard raisins to be used for such purposes as well as all residues such as chaff, large stems, cap stems, blowers, light raisins, belt or machine residues, and other materials lost or removed during the processing of raisins, irrespective of quality.

On July 7, 1964, the United States Department of Agriculture amended Raisin Order No. 89 and said, among other things: "It is hereby ordered that on and after the effective date hereof all handling of raisins produced from grapes grown in California shall be in conformity to, and in compliance with the order regulating the handling of raisins produced from grapes grown in California. . . ."

In connection with the amended order, the Secretary of Agriculture of the United States made additional findings of fact, among them being as follows: "Producers and handlers still have in their possession larger than usual quantities of off-grade raisins or raisin residual material, or both, resulting mainly from rain damage to the 1963 raisin production; and such raisins and material cannot be disposed of in the normal outlets for standard quality raisins. The availability of the new outlets should, therefore, be made effective immediately to facilitate disposition of such raisins and material as promptly as possible. Such disposition would tend to prevent further deterioration with consequent loss of value, reduce off-grade carry over into the 1964-65 crop year and at the same time be in the interest of sanitation."

By the terms of the order, it was provided: "That a handler may receive raisins for inspection, may receive off-grade raisins for reconditioning, and may receive or acquire off-grade raisins for use in eligible non-normal outlets."

Raisin Order No. 89 further provided that all offgrade raisins except those returned unstemmed to the grower and any raisin residual material received or accumulated by a handler and any raisins received as standard, but which later failed to meet the applicable grade tests, should "be disposed of or marketed by the handler, without further inspection, in eligible non-normal outlets."

On the face of the instruments it seems clear that the orders of the federal and the state Departments of Agriculture are at direct odds with each other, and that if, as believed by the trial court, the federal government has preempted the field, the state cannot legitimately make or enforce any mar-

keting order which disregards or opposes federal requirements.

In this connection, the applicants for the writ of supersedeas contend that the state order was one which regulated the quality of additives to certain wines, and that on the authority of *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U.S. 132 [83 S.Ct. 1210, 10 L.Ed.2d 248], the state has the right to make and enforce provisions relative to the quality of agricultural products.

█ The question now before us is whether or not this court should issue a writ of supersedeas. We are not deciding the merits of the case at this time; that will be our duty at a later stage of the appeal when we have before us the entire record and when in due course we can determine the basic questions involved in the trial of the case itself.

In *Dry Cleaners & Dyers Institute* v. *Reiss,* 5 Cal.2d 306, 309 [54 P.2d 470], it is said: "In this proceeding we are not called upon, nor is it within our province, to determine the validity of the order of injunction. That question must be left for determination by the court at the hearing of the appeal from said order."

The concurring opinion of Mr. Justice Sloss in *Hulbert* v. *California etc. Cement Co.,* 161 Cal. 239, at page 255 [118 P. 928, 38 L.R.A. N.S. 436], points out that in a proceeding for a writ of supersedeas, the court is not reviewing the correctness of the determination of the trial court that an injunction should issue.

And in *Food & Grocery Bureau* v. *Garfield,* 18 Cal.2d 174, 178 [114 P.2d 579], the court holds that in a proceeding for supersedeas "The correctness of the trial court's ruling on the subject [of injunction], and the question of what the ultimate decision should be, are not matters of concern in this proceeding."

The author of the opinion in *Smith* v. *Smith,* 18 Cal.2d 462, 464-465 [116 P.2d 3], states: "It is not the function of such a writ to reverse, supersede or impair the force of, or pass on the merits of the judgment or order from which the appeal is taken; the validity of such judgment or order is to be reviewed on the appeal therefrom." (See also: *Estate of Dabney,* 37 Cal.2d 402, 406-407 [232 P.2d 481]; *People* v. *Stutz,* 66 Cal.App.2d 791, 792 [153 P.2d 182]; *Saltonstall* v. *Saltonstall,* 148 Cal.App.2d 109 [306 P.2d 492].)

At the hearing of the order to show cause why a writ of supersedeas should not issue, plaintiffs objected to the petition

saying that the court below announced its decision to issue an injunction on August 7, 1964, that it made a minute order to that effect and filed a comprehensive opinion on that date, that the appeal was filed on the same date by the petitioners, but that the actual order for a preliminary injunction was only signed and filed on the following Monday. This court overruled the objection, finding under subdivision (c) of rule 2 of the California Rules of Court that the notice of appeal filed prior to the rendition of the order, but after the judge had announced his intended ruling, should be treated as filed immediately after entry of the order for a preliminary injunction. A closely allied point urged by respondents and also overruled was that the petition was defective in that the date and a proper description of the judgment were not included. ▆ A third objection to the proceeding in this court was that the appellants had not first exhausted their right to seek a stay of proceedings in the lower court by failing to show a preliminary application to that end. (*Tulare Irr. Dist.* v. *Superior Court,* 197 Cal. 649 [242 P. 725].) In this latter connection, the attorney for defendants testified that he had informed the trial judge that he intended to ask him for a stay of proceedings after the entry of the preliminary injunction, but the trial judge told him that he would not grant it. The law does not require a useless act.

▆ This case involves an appeal from what is clearly a prohibitory injunction; therefore, the appeal itself ". . . does not disturb the operative effect of the injunction." (3 Am. Jur., Appeal and Error, § 558, p. 205.) A prohibitory injunction is self-executing and its operation is not automatically stayed by an appeal from the order granting it. ▆ But *Food & Grocery Bureau* v. *Garfield, supra,* 18 Cal.2d 174, 177, points out: "Even in the case of a purely prohibitory decree, however, where there is no automatic stay and the appellant is not entitled to a writ of *supersedeas* as a matter of right, this court has inherent power to issue the writ if such action is necessary or proper to the complete exercise of its appellate jurisdiction."

▆ The issuance of a writ of supersedeas is not based on any statute, code section, or rule of court, but is within the inherent power of the court. (*City of Pasadena* v. *City of Alhambra,* 75 Cal.App.2d 91, 98 [170 P.2d 499]; 3 Witkin, Cal. Procedure, Appeal, § 59, p. 2210.) The issuance is a matter of sound discretion (*Milne* v. *Goldstein,* 194 Cal.App. 2d 552 [15 Cal.Rptr. 243]; *Friedman Bag Co., Inc.* v. *Shrier,* 194 Cal.App.2d 561, 563 [15 Cal.Rptr. 38]; *Bardwell* v.

*Turner,* 219 Cal. 228 [25 P.2d 978]; *Erickson* v. *Bohne,* 120 Cal.App.2d 606 [261 P.2d 782]; *Yee Kee Chong* v. *Pacific Freight Lines,* 72 Cal.App.2d 219, 220 [164 P.2d 43]; *Ballinger* v. *Ballinger,* 7 Cal.2d 307, 309 [60 P.2d 279, 61 P.2d 45]; *Farmland Irrigation Co.* v. *Dopplmaier,* 48 Cal.2d 208, 215 [308 P.2d 732, 66 A.L.R.2d 590]).

█ Whether or not a writ should issue depends "upon the special circumstances of each case" (*West Coast etc. Co.* v. *Contractors' etc. Board,* 68 Cal.App.2d 1, 6 [155 P.2d 863]). The proper attitude of an appellate court toward an application for a writ of supersedeas when a prohibitory injunction has been ordered by a lower court is thus discussed in the concurring opinion of Mr. Justice Sloss in *Hulbert* v. *California etc. Cement Co., supra,* 161 Cal. 239, 255-256:

"In this case the lower court has determined that it was essential, or at least proper, for the protection of the plaintiffs' rights that the defendant should be restrained. We are not now reviewing the correctness of that determination. The petitioner cannot, of course, ask us in this proceeding to stay the force of the injunction on the ground that the trial court abused its discretion or that it erred otherwise in granting the injunction. What is claimed is that a suspension of the judgment 'is necessary or proper to the complete exercise' of our appellate jurisdiction (Const., art. VI, § 4); it is claimed that a refusal to stay the injunction will so affect the subject of the controversy that, if the judgment should ultimately be reversed, the appellant will in large measure be deprived of the fruits of its successful appeal.

"But we must consider the rights of the respondents, as well as those of the appellants. If the judgment of the court below is right, the plaintiffs are absolutely entitled to have the wrongful acts stopped, not only after the determination of the appeal, but pending the appeal. Under the findings the acts complained of are inflicting a continuing injury upon the plaintiffs and their lands, an injury of a kind which has always been regarded by courts of chancery as irremediable and not capable of adequate redress by damages. If the appellant may ask that it shall not lose the fruits of an appeal which may turn out to be meritorious, the respondents are in at least as good a position to demand that the appellate court shall not irrevocably take away from them the benefit which they have already won and which will be confirmed to them if the judgment should be sustained. The exercise of

the appellate jurisdiction must contemplate the possibility of affirmances as well as reversals. I do not think a stay of execution can be said to be necessary or proper to the complete exercise of appellate jurisdiction when such stay can be granted only at the risk of destroying rights which will unquestionably belong to the respondent if the judgment of the lower court shall be affirmed.

"   .   .   .   .   .   .   .   .   .   .

"It may be suggested, further, that the effect of an order by this court suspending the operation of a prohibitory injunction is to reverse, *pro tanto,* the judgment granting the injunction, and that in advance of a hearing on the merits. That this is so will appear more clearly if we suppose the case of an appeal from an order of the superior court granting an injunction *pendente lite.* In such case, an application for a suspension of the injunction pending the appeal could be urged upon precisely the same grounds as those here presented by petitioner. The thing decided by the trial court, in the case supposed, was that defendant should be restrained until a trial on the merits, or until that court should order otherwise. That conclusion is reviewable on appeal, but to suspend the order before a hearing of the appeal would clearly be to set aside the very thing decided below, viz., that the defendant should be enjoined until a trial or a further order. The situation does not differ where the injunction is embraced in a final judgment. There, too, it is a part of the adjudication that the defendant should be enjoined at once, and this adjudication should not be set aside on appeal before a hearing on the merits of the appeal."

██  We must not balance conveniences on an application of this kind, and we must keep in mind not only the rights of the appellants if the order is ultimately reversed but the rights of the respondents if it is affirmed. We cannot presume error, and we should not interfere with the normal incidents of a prohibitory injunction in the absence of a clear and compelling proof of extraordinary circumstances. (*Ohaver* v. *Fenech,* 206 Cal. 118, 124 [273 P. 555]; *People* v. *Associated Oil Co.,* 211 Cal. 93 [294 P. 717]; *Dry Cleaners & Dyers Institute* v. *Reiss, supra,* 5 Cal.2d 306, 310; *Nuckolls* v. *Bank of California Nat. Assn.,* 7 Cal.2d 574 [61 P.2d 927]; *Clayton* v. *Schultz,* 12 Cal.2d 703, 708 [87 P.2d 355].) We note also that "No showing is made whatever that they [the litigants], or either of them, will suffer irreparable injury, . . ." if the injunction is in force. (*Dry Cleaners & Dyers Institute* v. *Reiss, supra,* 5 Cal.2d 306, 310.) Neither have the applicants

shown that a miscarriage of justice will occur in the absence of an issuance of the writ of supersedeas. (4a C.J.S., Appeal and Error, § 636, p. 453.)

The economic background of the grape and raisin industries is complex and predictions as to possible results from the enforcement of specific federal and state marketing orders are tenuous. The grower of grapes is sometimes a patron of either the fresh grape broker, the winery, or the raisin packer, or of all three in succession. It is beyond the capacity of anyone accurately to prophesy the economic result of the injunction ordered by the trial court, but this fact does not weaken the requirement that the appellants have the burden of establishing that the writ is necessary.

Our negative viewpoint relative to the issuance of a writ of supersedeas is strengthened by the reflection that the order enjoined will, by its terms, lapse on June 30, 1965, and that the completion of an appeal will take all or most of that time, so that a supersedeas, entirely apart from the merits of the case, would in practical effect be a decision contrary to the injunction and in favor of the appellants for most of the period involved.

When we bear in mind that no winery is compelled to acquire or use any of the materials included in the order, or any product of such materials, our belief is reinforced that a writ of supersedeas should be denied.

Furthermore, we cannot overlook the rule which has often been applied in similar circumstances in this state that a writ of supersedeas will not issue "where no process of or action by the court below is involved." (*Caminetti* v. *Guaranty Union Life Ins. Co.*, 22 Cal.2d 759, 763 [141 P.2d 423]; *Stewart* v. *Hurt*, 9 Cal.2d 39, 41-42 [68 P.2d 726]; *City of Southgate* v. *City of Los Angeles*, 6 Cal.2d 593, 595 [58 P.2d 1288]; *McCann* v. *Union Bank & Trust Co.*, 4 Cal.2d 24, 27 [47 P.2d 283]; *Hulse* v. *Davis*, 200 Cal. 316, 317 [253 P. 136]; *In re Imperial Water Co. No. 3*, 199 Cal. 556 [250 P. 394]; *Rose* v. *Mesmer*, 131 Cal. 631, 634 [63 P. 1010]; *Dulin* v. *Pacific Wood & Coal Co.*, 98 Cal. 304 [33 P. 123]; *Solorza* v. *Park Water Co.*, 80 Cal.App.2d 809, 812 [183 P.2d 275], and *People* v. *City of Westmoreland*, 135 Cal.App. 517 [27 P.2d 394].) In this case the preliminary injunction is self-executing, and the rule is applicable.

The temporary stay of proceedings is dissolved; the petition for a writ of supersedeas is denied.

Stone, J., concurred.